# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHERYL WULTZ, *et al.* <br><br> Plaintiffs-Respondents, <br><br> v. <br><br> BANK OF CHINA LTD., <br><br> Defendant. <br><br> ——————————————— <br><br> THE STATE OF ISRAEL, <br><br> Petitioner. | No. 11 Civ. 1266 (SAS) <br><br> **ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS-RESPONDENTS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER'S MOTION TO QUASH

BOIES, SCHILLER & FLEXNER LLP
David Boies
Mary Boies
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

Lee Wolosky
Steven I. Froot
Marilyn C. Kunstler
Joseph W. Dunn
575 Lexington Avenue
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

Date: June 20, 2014

# **TABLE OF CONTENTS**

STATEMENT OF FACTS ............................................................................................................. 1

    **1.**    With the Fact Discovery Cutoff Approaching, Plaintiffs Contacted Uzi Shaya About a Voluntary Deposition Limited to Mr. Shaya's Time as a Private Citizen. ........................................................................................................ 1

    **2.**    The GOI Threatened to Arrest Mr. Shaya if He Attempted to Meet with Plaintiffs to Discuss a Voluntary, Limited Deposition. .......................................... 3

    **3.**    The GOI Has Confirmed that It Will Prevent Mr. Shaya from Testifying Regardless of this Court's Ruling on Its Motion to Quash. .................................... 3

    **4.**    Meanwhile, the GOI Made No Objection to BOC's Seeking Testimony from Bank Hapoalim on the Same Subjects It Claims Are "State Secrets" Here. ....................................................................................................................... 4

ARGUMENT .................................................................................................................................. 6

    I.    THE COURT SHOULD DECLINE TO RULE ON GOI'S MOTION TO QUASH BECAUSE THE GOI'S RECENT CONDUCT DISENTITLES IT TO A RULING. .................................................................................................... 6

    II.    THE GOI'S RECENT CONDUCT CONFIRMS PLAINTIFFS' PRIOR ARGUMENTS AS TO WHY THE MOTION TO QUASH SHOULD BE DENIED. ............................................................................................................... 10

CONCLUSION ............................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Sims*,
 788 F.2d 954 (3d Cir. 1986) .................................................................................................. 6

*Bonahan v. Nebraska*,
 125 U.S. 692 (1887) ............................................................................................................... 6

*Eisler v. United States*,
 338 U.S. 189 (1949) ............................................................................................................ 6,7

*Empire Blue Cross & Blue Shield v. Finkelstein*,
 111 F.3d 278 (2d Cir. 1997) ............................................................................................. 6,7,8

*In re Grand Jury Subpoenas Dated March 9, 2001*,
 179 F. Supp. 2d 270 (S.D.N.Y. 2001) .................................................................................... 7

*Molinaro v. New Jersey*,
 396 U.S. 365 (1970) .......................................................................................................... 6,7, 8

*Northrop Corp. v. McDonnell Douglas Corp.*,
 751 F.2d 395 (D.C. Cir. 1984) ............................................................................................. 10

*Republic of Argentina v. NML Capital, Ltd.*,
 --- U.S. --- (2014) (No. 13-990), *cert. denied* (U.S. Jun. 16, 2014) .................................... 8,9

*Smith v. United States*,
 94 U.S. 97 (1876) ....................................................................................................... 6, 7, 8, 9

*United States v. Mann*,
 2003 WL 1213288 (S.D.N.Y. Mar. 17, 2003) ....................................................................... 7

Plaintiffs-Respondents Sheryl Wultz, Yekutiel Wultz, Amanda Wultz, and A.L.W. (collectively, "Plaintiffs-Respondents" or "Plaintiffs") respectfully submit this Supplemental Memorandum of Law in Opposition to the Motion to Quash filed by Petitioner the State of Israel (the "Motion to Quash" or "Motion") in order to apprise the Court of events that have occurred since the completion of briefing on the Motion to Quash, including recent misconduct by the Government of Israel ("GOI"). Based on those events, the Court should decline to rule on the Motion to Quash, or, in the alternative, the Motion should be denied. Pursuant to Section IV.F of the Court's Individual Rules and Procedures, Plaintiffs respectfully request oral argument on the GOI's Motion to Quash specifically to address the new facts and arguments raised herein.

## STATEMENT OF FACTS

The key facts relevant to the GOI's Motion to Quash, which was originally filed in the U.S. District Court for the District of Columbia (the "District of Columbia Court") and subsequently transferred to this Court by Order dated May 30, 2014, are set forth in detail in Plaintiffs-Respondents' submissions made prior to the transfer. *See* Resp't's Corrected Mem. of Law. in Opp'n to Petitioner's Mot. to Quash ("Plaintiffs' Opposition"), *Wultz v. Bank of China, Ltd.*, Misc. No. 13-1282 (D.D.C. Jun. 9, 2014) (Dkt. # 22); Mot. for Leave to File Surreply to Petitioner's Reply Br. in Supp. of Its Mot. to Quash, *Wultz v. Bank of China, Ltd.*, Misc. No. 13-1282 (D.D.C. Jun. 9, 2014) (Dkt. # 32). The facts warrant denial of the GOI's Motion to Quash, for the reasons set forth in the prior submissions. Events occurring after briefing was completed in February 2014, however, described below, also bear on this Court's resolution of the Motion.

**1. With the Fact Discovery Cutoff Approaching, Plaintiffs Contacted Uzi Shaya About a Voluntary Deposition Limited to Mr. Shaya's Time as a Private Citizen.**

According to the GOI, Uzi Shaya ended his tenure as an official of the GOI in 2007, and has been a private citizen since that time. *See* Decl. of Maj. Gen. Y. Amidror at ¶ 5, *Wultz v.*

1

*Bank of China, Ltd.*, Misc. No. 13-1282 (D.D.C. Jun. 9, 2014) (Dkt. # 1-2). As Plaintiffs already have explained, and the GOI has not denied, in the approximately seven years since his government service ended and during which he has undisputedly been a private citizen, Mr. Shaya has acquired personal knowledge of facts relevant to Plaintiffs' claims against defendant Bank of China Ltd. ("BOC"). The relevant personal knowledge that Mr. Shaya has acquired in his capacity as a private citizen includes, for example, knowledge of the efforts of BOC and its majority owner, the People's Republic of China ("PRC"), to cover up BOC's support for terrorism by pressuring the GOI to obstruct Mr. Shaya's testimony—efforts that Mr. Shaya has himself described in conversations directly with Yekutiel Wultz.[1]

Despite the efforts of BOC and the PRC to prevent his deposition,[2] Mr. Shaya has remained willing to testify voluntarily in this case, including about events post-dating his government service. *See* Decl. of L. Wolosky dated June 20, 2014 ("Wolosky Decl."), Exs. 1–2 (3/20/13 Ltr. from U. Shaya to L. Wolosky, R. Tolchin, and R. Berger; 8/29/13 Ltr. from U. Shaya to N. Darshan-Leitner and L. Wolosky). Accordingly, on April 18, 2014, after the GOI's Motion to Quash had been pending before the District of Columbia Court for five months and with the fact discovery cutoff in this case (then June 21, 2014) fast approaching, Plaintiffs sent Mr. Shaya a letter requesting his appearance at a voluntary deposition "limited in scope to only

---

[1] As Mr. Wultz testified at his deposition (*see* Plaintiffs' Opposition, Ex. 28), Mr. Shaya told him during an in-person meeting in May 2013 that "there was tremendous and mounting pressure from the Chinese government on the GOI to prevent [Mr. Shaya] from testifying against BOC." Pls. Opp'n, Ex. 7 (Yekutiel Wultz Decl.), at ¶ 26.

[2] Those efforts to obstruct Mr. Shaya's testimony, which have been widely reported in the press and are foreshadowed by BOC's own documents, are explained in detail in Plaintiffs' Memorandum of Law in Opposition to the Motion to Quash that was filed in the District of Columbia Court. *See* Pls. Opp'n at 15–19. As recorded in the minutes of a meeting between BOC and the PRC in 2010, BOC and the PRC have for years been operating under an agreement to "maintain[] a consistent front" to "formally and publicly deny the meetings" about which Mr. Shaya is expected to testify. Wolosky Decl., Ex. 4 (7/19/13 Hr'g Tr. (Scheindlin, J.)) at 16:8–12. BOC and the PRC have pursued this strategy in reliance on their hope that the GOI would "not provide the content of meetings between the countries to courts." *Id.* at 16:14–20.

2

the time period after [Mr. Shaya's] tenure as an official of the Government of Israel." Wolosky Decl., Ex. 3 (4/18/14 Ltr. from L. Wolosky to U. Shaya). Plaintiffs specified that they "would confine their questions to the period after [Mr. Shaya] ceased being an official of the GOI, during which time [he has] been a private citizen." *Id.* A copy of this letter was provided to the GOI.

**2.    The GOI Threatened to Arrest Mr. Shaya if He Attempted to Meet with Plaintiffs to Discuss a Voluntary, Limited Deposition.**

After Mr. Shaya agreed to proceed, Plaintiffs' counsel scheduled a meeting with Mr. Shaya, to take place on Monday, June 2, 2014, to discuss the logistics of the voluntary, limited-scope deposition requested in their April 18, 2014 letter. On Thursday, May 29, 2014, however, Mr. Shaya was summoned for questioning by the YAHBAL (יאח"בל), or serious international crimes investigative unit of the Israeli Police.[3] Plaintiffs understand that when Mr. Shaya went in for questioning, the Israeli Police warned him that he would be arrested if he met with Plaintiffs' counsel on June 2, 2014, or attempted to do so, even though the purpose of the meeting was to discuss matters solely relating to Mr. Shaya's time as a private citizen. Because of these threats, Mr. Shaya, fearing incarceration, cancelled his meeting with Plaintiffs' counsel.[4]

**3.    The GOI Has Confirmed that It Will Prevent Mr. Shaya from Testifying Regardless of this Court's Ruling on Its Motion to Quash.**

Upon learning that Mr. Shaya had been called in for questioning by the YAHBAL and

---

[3] The YAHBAL is one of the five units within *Lahav 433*, a division of the Israeli Police known as the "Israeli FBI" for its similarities to the United States' Federal Bureau of Investigation.

[4] Mr. Shaya being summoned for questioning by the Israeli Police and threatened with incarceration if he were to testify in this case came at the same time as high-profile meetings in Israel involving officials of the PRC. *See, e.g.*, Wolosky Decl., Exs. 5–6 (David Shamah, *Israel, China to Open $300 million research center*, THE TIMES OF ISRAEL (May 19, 2014, 5:59 PM), http://www.timesofisrael.com/israel-china-to-open-300-million-research-center/; Yaacov Benmeleh, *Israel's Tech Industry Is Becoming All About 'China, China, China'*, BLOOMBERG (May 29, 2014), http://www.bloomberg.com/ news/print/2014-05-29/israel-s-tech-industry-is-becoming-all-about-china-china-china.html) (reporting the visit, in May 2014, of "[s]ome 350" Chinese businessmen and government officials to Tel Aviv, including China Vice Premier Liu Yandong, who met with Israeli Prime Minister Benjamin Netanyahu on May 19).

3

threatened with incarceration, Plaintiffs sent a letter on June 1, 2014, to U.S. counsel to the State of Israel, objecting to the GOI's efforts to obstruct Mr. Shaya's limited, voluntary testimony (the "June 1 Letter"). *See* Wolosky Decl., Ex. 7 (6/1/14 Ltr. from L. Wolosky to J. Bellinger). The June 1 Letter requested that the GOI confirm in writing by June 2, 2014, that it would stop adhering to demands of the PRC to block Mr. Shaya from testifying, as a voluntary witness, concerning facts and events relating to his time as a private citizen. *Id.* On June 2, 2014, the GOI replied that it was preparing a response to Plaintiffs' June 1, 2014 letter, to be sent after the conclusion of a Jewish holiday on June 5, 2014.

Plaintiffs did not receive any written response from the GOI to the June 1, 2014 Letter. Accordingly, Plaintiffs sent the GOI's U.S. counsel another letter on June 16, 2014 (the "June 16 Letter") (Wolosky Decl., Ex. 8), to which the GOI also has not responded in writing. The GOI has stated in emails that it believes that the June 1 Letter and the June 16 Letter contain "false and disingenuous allegations" but, other than disputing that the threats made to Mr. Shaya were undertaken "in collusion" with Defendant BOC, the GOI has not specifically disputed the basic facts described above or in either letter. Instead, the GOI has suggested through counsel that it will not allow Mr. Shaya to testify in this case, even under compulsion or pursuant to a valid subpoena (*see, e.g.*, June 16 Letter)—which would be an outrageous result. And, despite multiple requests by Plaintiffs, the GOI has provided no basis, in U.S. or Israeli law, for its actions to obstruct Mr. Shaya's voluntary testimony on subjects limited Mr. Shaya's personal knowledge gained in the time since he left government service in 2007.

**4.     Meanwhile, the GOI Made No Objection to BOC's Seeking Testimony from Bank Hapoalim on the Same Subjects It Claims Are "State Secrets" Here.**

During the same period in which the GOI has actively obstructed Plaintiffs' efforts to arrange a voluntary, limited-scope deposition of Mr. Shaya, it has also declined to take any

4

action to prevent *BOC* from eliciting testimony on the same subjects from BOC's chosen third-party witness, the Israel-based financial institution Bank Hapoalim B.M. ("Bank Hapoalim" or "Hapoalim"). On June 20, 2013, BOC issued a subpoena to Bank Hapoalim pursuant to which BOC intends to take Rule 30(b)(6) deposition testimony of Hapoalim on a variety of confidential GOI communications and operations. *See* Wolosky Decl., Ex. 9 (BOC's Second Am. Notice of Fed. R. Civ. P. 30(b)(6) Dep. to Hapoalim). On May 30, 2014, Plaintiffs cross-noticed the Bank Hapoalim deposition and served their own deposition subpoena on Hapoalim (Wolosky Decl. Ex. 10). The topics noticed for the Hapoalim deposition include, among others:

- "Any communication between Bank Hapoalim and the [Mossad], the [Shin Bet], or the Office of the Prime Minister of Israel concerning the Shurafa Accounts, Palestinian Islamic Jihad . . . Hamas, or BOC during the period from 2003–2008";
- "All fund transfers, transactions or accounts that were stopped, rejected, reversed, or held for any reason . . . by Bank Hapoalim at the request of the Mossad, Shin Bet or the Office of the Prime Minister of Israel";
- "Whether Israeli Officials notified or warned Hapoalim of any alleged connection between Shurafa and terrorists";
- "Whether the Israeli Government attempted to block, restrict or prevent Hapoalim from originating or executing any of the Shurafa Wire Transfers"; and
- "Whether the Israeli Government . . . took any steps to block, restrict or prevent wire transfers to Shurafa's BOC accounts that were originated at [Bank of Palestine] and cleared through Hapoalim between 2003 and 2008."

Wolosky Decl., Exs. 9–10. As Plaintiffs have advised the GOI, these topics are substantively indistinguishable from the topics that Mr. Shaya is expected to testify about in this case, and which the GOI has claimed are protected by a state secrets privilege.

Despite being put on notice by Plaintiffs of BOC's intent to seek testimony from Bank Hapoalim on the same type of information that the GOI has claimed is protected by the state secrets privilege and is otherwise protected from disclosure, the GOI has to this day not moved to quash BOC's subpoena, nor (to Plaintiffs' knowledge) taken any other action with respect to

5

BOC's efforts to elicit from Hapoalim the same type of sensitive information at issue here on the pending Motion. BOC's deposition of Bank Hapoalim is currently scheduled for July 1, 2014.

## ARGUMENT

### I. THE COURT SHOULD DECLINE TO RULE ON GOI'S MOTION TO QUASH BECAUSE THE GOI'S RECENT CONDUCT DISENTITLES IT TO A RULING.

In light of the GOI's obstruction of Mr. Shaya's voluntary testimony as a private citizen and the GOI's position that it will not allow Mr. Shaya to testify even under compulsion, this Court should decline to hear the GOI's Motion to Quash under the doctrine of disentitlement. A U.S. court should decline to hear an application for relief where its ruling would be futile because the applicant "will respond to a judgment only if it is favorable." *Empire Blue Cross & Blue Shield v. Finkelstein* ("*Finkelstein*"), 111 F.3d 278, 282 (2d Cir. 1997) (quoting *Ali v. Sims*, 788 F.2d 954, 959 (3d Cir. 1986)).

The doctrine of disentitlement is well established in U.S. law, having originated from a line of nineteenth and twentieth century cases in which the U.S. Supreme Court declined to hear appeals from convicted criminals who were fugitives at the time of their appeals. The seminal case is *Smith v. United States*, 94 U.S. 97, 97 (1876), in which the Supreme Court ruled that "[i]t is clearly within our discretion to refuse to hear" the appeal of an escaped convict who, by virtue of his escape, could not "be made to respond to any judgment we may render." The Court reasoned that because the escaped convict was not likely to submit to any adverse ruling, the convict's appeal was likely to be "a moot case" and did not merit adjudication:

> If we affirm the judgment, he is not likely to appear to submit to his sentence. If we reverse it and order a new trial, he will appear or not, as he may consider most for his interest. Under such circumstances, we are not inclined to hear and decide what may prove to be only a moot case.

*Smith*, 94 U.S. at 97–98 (1876).

These principles were reaffirmed in *Bonahan v. Nebraska*, 125 U.S. 692 (1887); *Eisler v. United States*, 338 U.S. 189 (1949); and *Molinaro v. New Jersey*, 396 U.S. 365 (1970), three subsequent cases in which the Supreme Court, citing *Smith*, declined to hear the appeal of a fugitive convict. In each instance, the Supreme Court invoked its inherent discretion to decline to adjudicate the petitioner's case, reasoning that where "the petitioner by his own volition may have rendered moot any judgment on the merits" (*Eisler*, 338 U.S. at 190), the petitioner was "disentitle[d] . . . to call upon the resources of the Court for determination of his claims." *Molinaro*, 396 U.S. at 366.

The Second Circuit and this Court have since applied the doctrine of disentitlement as articulated by the Supreme Court in a variety of procedural and factual circumstances, including in civil cases and in the context of trial as well as appeal. *See, e.g.*, *Finkelstein*, 111 F.3d 278 at 281 ("we have noted and exercised our discretion to apply the fugitive disentitlement doctrine in appeals from a variety of civil cases and proceedings") (citing cases); *United States v. Mann*, 2003 WL 1213288, at *1 (S.D.N.Y. Mar. 17, 2003) ("Although the doctrine originated in the context of appeals, it is available in the trial context as well.") (quoting *In re Grand Jury Subpoenas Dated March 9, 2001*, 179 F. Supp. 2d 270, 286 (S.D.N.Y. 2001)). As articulated by the Second Circuit in the context of an appeal by a fugitive criminal defendant, the appropriateness of applying the doctrine of disentitlement turns on the extent to which the following four "rationales" will be furthered:

1) assuring the enforceability of any decision that may be rendered;
2) imposing a penalty for flouting the judicial process;
3) discouraging flights from justice and promoting the efficient operation of the courts; and
4) avoiding prejudice to the other side.

*Finkelstein*, 111 F.3d at 280.

7

Under these rationales and the principles articulated in *Smith v. United States* and its progeny, this Court should find that the GOI is not entitled to a ruling on its Motion to Quash Plaintiffs' subpoena to Uzi Shaya, and should accordingly decline to adjudicate the GOI's Motion. By stating that it will not permit Mr. Shaya to testify under compulsion in any circumstance—even pursuant to a valid subpoena—and by threatening Mr. Shaya with incarceration if he were to testify even about matters solely relating to his time as a private citizen, the GOI has established beyond any doubt the lack of "enforceability of any decision that may be rendered against" it on its Motion to Quash (*Finkelstein*, 111 F.3d at 278). This is a classic "heads I win, tails you lose" situation: were the Court to deny GOI's Motion to Quash, in whole or in part, the GOI would simply preclude enforcement of Plaintiffs' valid subpoena to Mr. Shaya by detaining (or incarcerating) him in Israel—as the GOI has already threatened to do merely for meeting with Plaintiffs' counsel to discuss the logistics of a voluntary, limited-scope deposition.[5] This is precisely the "flouting [of] the judicial process" (*Finkelstein*, 111 F.3d at 278) that the doctrine of disentitlement exists to prevent. *See Smith*, 94 U.S. at 97–98 (declining to hear appeal where, regardless of the ruling, the party would act "as he may consider most for his interest"). Because on the instant Motion the GOI "will respond to a judgment only if it is favorable," there is "no reason to entertain [its] cause" (*Finkelstein*, 111 F.3d at 282), and the GOI is "disentitle[d] . . . to call upon the resources of the Court for determination of [its] claims." *Molinaro*, 396 U.S. at 366.

---

[5] At minimum, in light of the GOI's recent conduct, in order for the Court to adjudicate the GOI's Motion to Quash, the GOI should be required to represent to Plaintiffs and the Court that in the event that its Motion is denied or denied in part, the GOI will not obstruct a compelled deposition of Mr. Shaya on whatever subjects, and on whatever terms, the Court deems appropriate. In the absence of such a representation, the adjudication of the GOI's motion to quash would be a pointless expenditure of judicial resources.

8

A group of six former federal judges recently called for an analogous application of the doctrine of disentitlement against the Republic of Argentina, in an *amicus* brief that they filed in opposition to Argentina's petition for a writ of certiorari from the Supreme Court in *Republic of Argentina v. NML Capital, Ltd.*, --- U.S. --- (2014) (No. 13-990), *cert. denied* (U.S. Jun. 16, 2014) ("*NML Capital*"). *See* Wolosky Decl., Ex. 11 (the "*NML Capital* Brief"). As the former judges' brief sets forth, by the time of its petition for a writ of certiorari in *NML Capital*, the Government of Argentina had, through its statements and actions, "demonstrated that it will make every effort to evade any adverse rulings issued by American courts, even as it attempts to use the very same court system to appeal those rulings." *NML Capital* Brief at 5.[6] The former judges correctly recognized that Argentina's status as a foreign government did not weigh in favor of adjudicating its appeal, noting that this "could encourage the view that contumacious behavior by a state actor will be suffered more tolerantly than the same behavior by an ordinary litigant." *Id.* at 7.

The same facts and considerations are present here. Now that the GOI has demonstrated that, should there be an adverse ruling, it will take specific steps to evade it—including by arresting Mr. Shaya to physically prevent him from testifying in these proceedings—there is no practical reason for this Court to adjudicate the Motion. As the six former federal judges wrote of the Government of Argentina in *NML Capital*, Israel is not entitled to a ruling on its Motion because it "has already determined that it can be the only prevailing party." *NML Capital* Brief at 4.

---

[6] In their brief, the former judges explained that under the disentitlement doctrine articulated in *Smith* and the other Supreme Court cases cited above, the Supreme Court should deny Argentina its requested relief, because "a party that comes to court unwilling to accept any but a favorable outcome should not be heard." *NML Capital* Brief at 5; *see also id.* ("This is especially true for a party like Argentina which has already submitted voluntarily to the jurisdiction of the federal courts but has nevertheless stated explicitly and publicly its intention to defy their rulings.").

9

## II. THE GOI'S RECENT CONDUCT CONFIRMS PLAINTIFFS' PRIOR ARGUMENTS AS TO WHY THE MOTION TO QUASH SHOULD BE DENIED.

Should the Court decide to adjudicate the GOI's Motion to Quash despite the GOI's recent conduct demonstrating the futility of any ruling against it, the Court should deny the Motion for all of the reasons stated in Plaintiffs' prior submissions to the District of Columbia Court, all of which are further buttressed by the GOI's recent conduct.

*First*, the GOI has neither denied its role in causing this litigation to be brought in the first place (and in drawing, very substantially, on scarce judicial resources in two federal judicial districts over the course of six years), nor disputed that the substance of the testimony sought from Mr. Shaya has already been disclosed to Plaintiffs and in public filings in this and other Anti-Terrorism Act cases, as explained in Plaintiffs' prior submissions.

*Second*, the GOI still has not identified any authority precluding Mr. Shaya from testifying on matters about which he acquired personal knowledge in his capacity as a private citizen during the seven-year period post-dating his government service, when no official immunity or similar objections could possibly be interposed, despite Plaintiffs' multiple requests that the GOI do so in the wake of the threats made to Mr. Shaya by the Israeli Police in May.[7]

*Third*, the GOI's failure to act in any way to prevent BOC from eliciting testimony from Bank Hapoalim on the same subjects about which Mr. Shaya would testify further confirms that the GOI has not met its burden to show that Mr. Shaya's deposition would pose "a reasonable danger [of] harm" to Israeli national security. *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 402 (D.C. Cir. 1984).

---

[7] The GOI lacks authority to preclude testimony concerning prior periods for the reasons set forth in Plaintiffs' Opposition to the GOI's Motion to Quash (*see* Plaintiffs' Opposition at 20–45), but those issues are outside the scope of this filing.

10

## CONCLUSION

For the reasons stated above and in their submissions originally filed in the U.S. District Court for the District of Columbia, Plaintiffs respectfully request that the Court decline to rule on the GOI's Motion to Quash, or, in the alternative, that the Motion be denied in its entirety.

Dated: June 20, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

/s/ David Boies
David Boies
Mary Boies
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300

/s/ Lee Wolosky
Lee Wolosky
Steven I. Froot
Marilyn C. Kunstler
Joseph W. Dunn
575 Lexington Avenue
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

*Counsel for Plaintiffs-Respondents*