UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

SHERYL WULTZ, *et al*.,

                         Plaintiffs,

                -against-

BANK OF CHINA LIMTED,

                      Defendant,

                -against-

RIVKA MARTHA MORIAH, *et al*.,

                      Intervenors,

                -against-

STATE OF ISRAEL,

                      Non-party movant.

--------------------------------------------------------------------- X

Docket No.:
14-mc-246 (SAS)

---

**MEMORANDUM OF LAW IN SUPPORT OF
INTERVENORS' MOTION FOR INTERLOCUTORY
CERTIFICATION PURSUANT TO 28 U.S.C. § 1292**

---

# THE BERKMAN LAW OFFICE, LLC

*Attorneys for the Plaintiff*

111 Livingston Street, Suite 1928

Brooklyn, New York 11201

718-855-3627

**Table of Contents**

TABLE OF AUTHORITIES ............................................................................................ *ii*

ARGUMENT

I.      The Standard Pursuant to 28 U.S.C. § 1292 ....................................................3

II.     The Issues Addressed in the Shaya Orders are "Controlling Question[s] of Law" for the Purposes of 28 U.S.C. § 1292(b) ...........................................................6

III.    Certifying the Shaya Orders for Interlocutory Certification "May Ultimately Advance the Ultimate Termination of the Litigation" ...............................................8

IV.     Reasonable Minds May Differ with the Court's Conclusions in the Shaya Orders ..........10

CONCLUSION .........................................................................................................16

## Table of Authorities

### Cases

*Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013) ..................................................................4

*Doninger v. Niehoff*, 642 F.3d 334 (2d Cir. 2011)..................................................................4, 10

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ..................................................10

*In re Flor*, 79 F.3d 281 (2d Cir. 1996)..................................................................10

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) ..................................................4, 6

*Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247 (D.D.C. 2011)..................................................11

*Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697 (5th Cir. 1961) ..................................................5

*Johnson v. Burken*, 930 F.2d 1202 (7th Cir. 1991)..................................................4, 6

*Katz v. Carte Blanche Corp.*, 496 F.2d 747 (3d Cir. 1974) ..................................................3, 6, 9

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in
   Amministrazione Straordinaria*, 921 F.2d 21 (2d Cir. 1990) ..................................................6

*Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457 (S.D.N.Y. 2006)..................................................11

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)..................................................4

*Mullins v. City of New York*, No. 04-cv-2979,
   2008 WL 118369 (S.D.N.Y. 2008) (Scheindlin, *J.*) ..................................................10

*N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*,
   666 F.2d 50 (4th Cir. 1981) ..................................................4

*NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*,
   652 F.3d 172 (2d Cir. 2011)..................................................10

*Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Associates, Inc.*,
   86 F.3d 656 (7th Cir. 1996) ..................................................6

*Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*,
   358 F. Supp. 2d 347 (S.D.N.Y. 2005) (Scheindlin, *J.*) ..................................................10

*In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980)..................................................3

*Weber v. United States*, 484 F.3d 154 (2d Cir. 2007)..................................................3

*Wultz v. Bank of China*, No. 13-mc-1282 (D.D.C. May 30, 2014) (opinion)..................................................8

**Statutes and Rules**

28 U.S.C. § 1291 ................................................................................................3

28 U.S.C. § 1292(b) ...................................................................................... *passim*

28 U.S.C. § 1746 ..............................................................................................14


Fed. R. Civ. P. 45 .............................................................................................2

Local Rule 7.1 ...................................................................................................1

**Other Authority**

16 Fed. Prac. & Proc. Juris. § 3929 (3d ed.) ..............................................5

Restatement (Second) of Foreign Relations Law of the United States § 66(f).............................12


John B. Bellinger III, *The Dog that Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transn. L. 819 (2011) ..........................................11-12

*Wultz v. Bank of China*, Second Cir. No. 14-3050, Document 106-1 (2d Cir. Nov. 21, 2014) (Intervenors' Motion to Strike) ..........................................15-16

The Intervenors respectfully submit this memorandum in support of their motion, pursuant to Local Rule 7.1 and this Court's individual rules, requesting interlocutory certification pursuant to 28 U.S.C. § 1292(b) of three Orders of this Court, as described *infra*. The underlying facts are well known to the Court and are recited in brief here. The Intervenors, and the *Wultz* Plaintiffs (then represented by the undersigned) initiated this action and others upon receiving information from the government of non-party Movant State of Israel ("Israel"), which explicitly implicated BOC and promised to provide evidence and testimony to aid the plaintiffs' cases. Specifically, Israel agreed to allow Uzi Shaya ("Shaya"), a former Israeli national security officer, to testify on various matters relevant to this litigation, including various meetings that he had with Chinese governmental officials in which he and others informed the Chinese government that BOC was providing banking services to terrorists. He was further expected to provide evidence that BOC officials were aware that BOC was providing such banking services at various times prior to the terrorist attacks that gave rise to these actions. The Intervenors and the *Wultz* Plaintiffs initiated the underlying actions in explicit reliance on those representations by Israel, knowing that evidence of these meetings with Chinese officials or of China's spoliation of such evidence would establish actual knowledge on the part of BOC.

In 2012, the Office of the Prime Minister of Israel specifically authorized Mr. Uzi Shaya ("Shaya"), a former Israeli national security officer, to testify in support of these cases.[1] But in

---

[1] The Plaintiffs and Intervenors have offered considerable evidence in support of this claim. Among the notable examples of such evidence is a declaration from Israeli security advisor Mr. Shlomo Matalon (Exhibit A), which was provided by Israel, handwritten notes and other correspondence from Shaya in which he expresses a clear intent to testify (*e.g.*, Exhibits B-C), and sworn declarations of Mr. Yekutiel "Tuly" Wultz and Mrs. Sheryl Cantor Wultz (Exhibits D-E). Any more explicit contemporaneous evidence is in Israel's hands. Neither the Plaintiffs nor the Intervenors have had a meaningful chance to discover pertinent information from Israel—in no

2013, Israel reneged, apparently due to extreme diplomatic pressure from the Chinese government that the cases against BOC—which is owned and controlled by China—be made to "go away."[2] Only Israel has attempted to quash the deposition; Shaya wants to testify.[3]

In order to ensure Shaya's deposition, the Plaintiffs served a subpoena on Shaya while he was present in the District of Columbia on business. That subpoena, issued pursuant to the version of Fed. R. Civ. P. 45 ("Rule 45") then in existence, was issued by the federal district court for the District of Columbia under a miscellaneous docket number. The Israeli government, without attempting to intervene, filed a motion to quash that subpoena in D.C. The Intervenors subsequently requested and received transfer of that docket to this Court, where it was assigned miscellaneous docket number 14-mc-246.

Thereafter, by Order on July 21, 2014, this Court granted Israel's motion to quash. By Order dated August 7, 2014, it denied a motion for reconsideration made jointly by the Intervenors and Plaintiffs. And by Order dated August 12, 2014, the Court wrote: "An Opinion and Order dated July 21, 2014...resolved all pending motions. The Clerk of the Court is directed to *close this case*."[4] We refer to these three orders collectively as the "Shaya Orders."

---

small part because they have not had a chance to depose Shaya.

[2] *See*, *e.g.*, Exhibits F-G (news articles from Israeli media (together with certified translations into English) that make very clear the pressure that the Chinese government put on Netanyahu to abandon these cases); *see also* Exhibits D-E (corroborating the same).

[3] Shaya has never objected to the subpoena and did not move to quash it. He was voluntarily present in Your Honor's courtroom on October 21, 2014, at which time he spoke briefly at the Court's invitation. Exhibit H. He subsequently informed counsel to the Plaintiffs that he wishes to voluntarily testify in his personal capacity (DE 15 at 3) as provided for by the Court's Order of July 21, 2014.

[4] (DE 12 at 1) (emphasis added).

Relying principally upon the Court's direction that this miscellaneous case be finally closed, and believing that designation to indicate finality for the purposes of 28 U.S.C. § 1291, the Plaintiffs and Intervenors noticed their appeals from the three aforementioned orders on August 21, 2014. Israel subsequently moved to dismiss the appeal asserting that no final judgment had been entered and thus, the Second Circuit lacked jurisdiction over the appeal. Plaintiffs and Intervenors moved for a stay of the appeal and limited remand to enable Plaintiffs and Intervenors to move this Court for certification under § 1292(b), but Israel opposed that motion. The Second Circuit later dismissed those appeals on jurisdictional grounds, finding that "a final order has not been issued by the district court as contemplated by 28 U.S.C. § 1291." (DE 19 at 2). The Second Circuit's Order noted 28 U.S.C. § 1292(b), suggesting that it anticipated that the Plaintiffs and Intervenors would soon file this motion. *Id.* The mandate issued on February 4, 2015. *Id.*

## I.      The Standard Pursuant to 28 U.S.C. § 1292

28 U.S.C. § 1292(b) "provides...courts with a flexible tool for interlocutory review of complex and controlling questions of law. Interlocutory review is permitted to assure orderly and efficient administration of complex cases." *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1263 (7th Cir. 1980). It is "the result of dissatisfaction with the prolongation of litigation and with harm to litigants uncorrectable on appeal from a final judgment which sometimes resulted from strict application of the federal final judgment rule." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 753 (3d Cir. 1974); *Weber v. United States*, 484 F.3d 154, 159 (2d Cir. 2007) ("Congress...sought to assure the prompt resolution of knotty legal problems."). Section 1292(b) states that a district judge, upon making an order not otherwise appealable and determining that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the

litigation," may certify the same in an written order. Within ten days of that order being filed, a party seeking appellate review may apply for such review by the court of appeals. § 1292(b). The Second Circuit has determined that the three Orders at issue are interlocutory rather than final (DE 19 at 2) and are thus subject to § 1292.

Interlocutory certification is appropriate with regard to privilege and discovery matters, just as with regard to any other order that a district court might issue. Regarding privilege and discovery matters, the Supreme Court noted that the other statutory criteria "are most likely to be satisfied when a privilege ruling involves a new legal question or is of special consequence, and *district courts should not hesitate to certify an interlocutory appeal* in such cases." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (emphasis added); *Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (reiterating that, under such circumstances, "the district court 'should not hesitate to certify an interlocutory appeal.'"); *Doninger v. Niehoff*, 642 F.3d 334, 338 n.1 (2d Cir. 2011) (granting interlocutory appeal from order granting qualified immunity); *N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 51 (4th Cir. 1981) (granting interlocutory appeal from order limiting discovery); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1097 (5th Cir. 1970) ("Review under § 1292(b) is available where decision on [the availability of the attorney-client privilege] would affect the scope of the evidence in a complex case, even short of requiring complete dismissal."); *Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) ("There is no danger that a flexible standard [regarding the application of § 1292(b)] will result in inundating the courts of appeals with appeals under section 1292(b), since our permission to take such an appeal is required and may be withheld in our discretion, without even a statement of reasons.").

While it is often said that § 1292(b) is only to be applied "sparingly, in exceptional cases[,]... even a casual survey of the hundreds of appeals decided under § 1292(b) suggests that it is often used in cases that do not meet the 'exceptional' test." 16 FED. PRAC. & PROC. JURIS. § 3929 (3d ed.). As the Fifth Circuit explained:

> [T]here are occasions which defy precise delineation or description in which as a practical matter orderly administration is frustrated by the necessity of a waste of precious judicial time while the case grinds through to a final judgment as the sole medium through which to test the correctness of some isolated identifiable point of fact, of law, of substance or procedure, upon which in a realistic way the whole case or defense will turn. The amendment was to give to the appellate machinery of § 1291 through § 1294 a considerable flexibility operating under the immediate, sole and broad control of Judges so that within reasonable limits disadvantages of piecemeal and final judgment appeals might both be avoided. It is that general approach rather than the use of handy modifiers—which may turn out to be Shibboleths—that should guide us in its application and in determining whether the procedure specified has been substantially satisfied.

*Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703 (5th Cir. 1961) (footnote omitted). And that flexible approach is the preferred approach:

> The flexible approach to § 1292(b) is far superior to blind adherence to a supposed need to construe strictly any permission to depart from the final-judgment rule. The statute is not limited by its language to "exceptional" cases. Flexibility is justified in part because the statute itself was suggested and drafted by judges who were concerned with avoiding the rigors of the final-judgment rule. Such judge-inspired legislation should be subject to development by judges in light of their own perceptions of need, and their ability to control a potentially explosive source of appeals. Flexibility is further justified in light of the post-1958 growth in the availability of review under an elastic final-judgment rule, in the categories of interlocutory appeal as of right under § 1292(a), and in the use of extraordinary writs..... Vigorous utilization of § 1292(b) to limit expanded use of other appealability concepts could prove more efficient for courts and litigants alike.

16 FED. PRAC. & PROC. JURIS. § 3929 (3d ed.) (footnotes omitted).

## II.     The Issues Addressed in the Shaya Orders are "Controlling Question[s] of Law" for the Purposes of 28 U.S.C. § 1292(b)

The statutory requirement of "question[s] of law" demands that the orders being certified involve true legal questions (even if intertwined with factual issues) and are thus reviewable for error. And it demands that those issues are "controlling" in the sense that they are significant to the direction or conduct of the case, although not necessarily case-dispositive. *Johnson*, 930 F.2d at 1205-06 ("[The term 'controlling'] is not read literally. It could not be, because it is never one hundred percent certain in advance that the resolution of a particular question will determine the outcome or even the future course of the litigation. Therefore 'a growing number of decisions have accepted the rule that a question is controlling, even though its decision might not lead to reversal on appeal, if interlocutory reversal *might save time for the district court, and time and expense for the litigants*." (emphasis added)); *Garner*, 430 F.2d at 1097; *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Associates, Inc.*, 86 F.3d 656, 659 (7th Cir. 1996) ("The cases do not interpret the term ['controlling'] literally. A question of law may be deemed 'controlling' if its resolution is quite likely to affect the further course of the litigation, even if not certain to do so."); *Katz*, 496 F.2d at 755 ("'[C]ontrolling' means serious to the conduct of the litigation, either practically or legally."); *see also Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990) ("[T]he resolution of an issue need not necessarily terminate an action in order to be 'controlling[.']"). Any district court decision that would constitute "reversible error" after appeal from final judgment is "a controlling question of law" for the purposes of § 1292(b). *Katz*, 496 F.2d at 755 ("If the statute were interpreted to exclude any...order [that would constitute 'reversible error,'] that interpretation would be inconsistent with the clear intention of the sponsors to avoid a wasted trial.").

There is no question—and no dispute—that the decision regarding Shaya's deposition could have a significant impact on the outcome of this case. Such evidence would establish that BOC had actual knowledge that it was providing banking services to terrorists. And whether or not that evidence is presented during summary judgment briefing and at trial will certainly play a role "significant to the direction or conduct" of that briefing and/or trial. Similarly, Israel's decision to renege on its prior promises to the Intervenors and to refuse to provide clear direct evidence of the Israeli-Chinese meetings has had an enormous impact on these proceedings and on-going discovery. Absent Israel's cooperation and its evidence of the Israeli-Chinese meetings, the Intervenors have been forced to focus their attention on proving obstruction and/or spoliation of such evidence, which has resulted in significant motion practice before this Court.

Affirmative evidence of the meetings between Israeli and Chinese officials thus would significantly alter the nature of this litigation. It was the promise of this evidence that led to the filing of this case. Such evidence would be devastating to BOC's prospects for success, and is important to their claims against the Bank of China. With it, the Intervenors' chances of prevailing increase dramatically.

Forcing the case to continue to summary judgment and/or trial without obtaining review of the Shaya Orders will ensure further litigation related to spoliation. And, if final judgment is entered in favor of the Bank of China on the limited record that results from the Shaya Orders, and assuming (as this Court must for the purposes of assessing the propriety of this motion) that the Second Circuit reverses on the ground that Israel's motion to quash should have been denied, this case will return to this Court for further *discover*y, a second round of summary judgment or other dispositive motions, and possibly a second trial. This process would greatly extend the length of this litigation. But allowing the Shaya Orders to be appealed now will ensure certainty on that

issue central to this case while discovery continues before this Court. The net result will be a far simpler, shorter, and streamlined litigation.

Additionally, the Shaya Orders and the litigation with Israel are independent of the rest of the litigation against the Bank of China. This independence is indicated by several factors: 1) This Court gave the litigation surrounding the Shaya Orders a separate miscellaneous docket number and ordered that case to be closed. Indeed, the Shaya subpoena is the *only* matter in this miscellaneous docket and *the Shaya Orders are certainly "controlling" of this docket*. 2) The litigation related to the Shaya Orders addresses a subpoena issued in the District of Columbia. It remains in the District of Columbia. The federal district court transferred only Israel's motion to quash, not the subpoena itself. Jurisdiction over Shaya thus rests in the District of Columbia. (DE 9 at 9); *Wultz v. Bank of China*, No. 13-mc-1282 (D.D.C. May 30, 2014) (opinion) at 9-10, 17 (stating that absent Shaya's consent to be deposed elsewhere, the deposition will have to occur in the District of Columbia). The rest of the litigation, in contrast, is in New York and jurisdiction over the Bank of China is in New York. Finally, 3) the motion to quash was litigated exclusively by Israel—the Bank of China expressly declined to participate in the prior appeal—despite that Israel is not a party in this litigation and has not directly participated in any other part of the litigation.

The independence of this miscellaneous action thus provides an additional reason to allow it to move forward to final resolution through § 1292(b) certification, independent of the underlying litigation. .

### III.   Certifying the Shaya Orders for Interlocutory Certification "May Ultimately Advance the Ultimate Termination of the Litigation"

For the reasons stated in the prior section, certifying the Shaya Orders for interlocutory appeal "may ultimately advance the ultimate termination of the litigation," as required by

§ 1292(b). If the orders are reversed after a final judgment in favor of Bank of China, a second round of discovery and a second trial will likely be necessary. But if interlocutory certification is granted and the orders are reversed prior to trial, the need for repetitive briefing would be obviated. And if the orders are affirmed, the Court and parties would at least have the benefit of clarity on this critical piece of evidence that provided the basis for the filing of the lawsuit in the first instance. Accordingly, allowing the discrete issues addressed in the Shaya Orders to be reviewed now will likely cause the underlying litigation to resolve considerably more quickly than forcing the case to final judgment prior to appellate review as doing so will require this Court and the Parties to re-do a great deal of their work before this court. *See Katz*, 496 F.2d at 755 ("[T]he clear intention of the sponsors [of § 1292(b) was] to avoid a wasted trial" who placed great emphasis on "saving [the] time of the district court and [minimizing] expense to the litigants.").

Said differently, judicial economy will be aided by allowing review of the Shaya Orders now. The Second Circuit will very likely have to review the Shaya Orders one day—that seems unavoidable; it is difficult to imagine that they might affirm dismissal or a jury verdict against the Intervenors without considering whether the Shaya subpoena was properly quashed.[5] But this Court faces a true choice. It does not need to traverse summary judgment motions and possibly a trial on two separate occasions. If it certifies the Shaya Orders for interlocutory review now, it likely will not have to. If, however, the Court demands that the Intervenors await final judgment before seeking review of the Shaya Orders, it appears likely that, upon remand, this Court will

---

[5] The Second Circuit might well determine that the Shaya Orders were properly rendered but reverse a verdict against the Intervenors on the ground of spoliation or some other grounds. But it is difficult to imagine how the Second Circuit might get there without first reviewing what seems to be the predicate issue: whether the Shaya subpoena was valid.

have to re-open discovery and then preside over another round of dispositive motions, possibly followed by a second trial. To do so is a waste of this Court's scarce resources.

## IV.  Reasonable Minds May Differ with the Court's Conclusions in the Shaya Orders

The Second Circuit has indicated that the statutory term "substantial ground for difference of opinion" requires only that the matters addressed in the subject order or orders be "unresolved." *NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 197 (2d Cir. 2011); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 471 (2d Cir. 2007). That is not to say that "the *mere* presence of a disputed issue that is a question of first impression, *standing alone*, is []sufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (*dictum*) (emphasis added). Rather, the district court must consider the issue for itself and determine whether the matter of first impression is adequately certain to place it outside that prong of § 1292(b). The existence of a matter of first impression, however, in the face of some doubt or uncertainty, is generally sufficient to warrant interlocutory certification. *See Mullins v. City of New York*, No. 04-cv-2979, 2008 WL 118369, at *2 (S.D.N.Y. 2008) (Scheindlin, *J.*). And with regard to issues that are not matters of first impression, the moving party must show only that the issues in question remain "unresolved" in that they do not rest on clear precedent or a consensus of cases. *See Doninger*, 642 F.3d at 338 & n.1. Indeed, this Court has previously found orders to be subject to "substantial ground for difference of opinion" on the basis of an order's reliance on weak or undeveloped precedent. *Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 353 (S.D.N.Y. 2005) (Scheindlin, *J.*).

The phrase "substantial ground for difference of opinion" also does not require a showing that the district court had committed *error*. It requires only that the moving party demonstrate that

that "[r]easonable minds may differ" about the district court's decision. *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 468 (S.D.N.Y. 2006) *aff'd in part rev'd in part* 133 S. Ct. 1659 (2013). Indeed, it is common for district courts to simultaneously deny motions for rehearing and also grant certification pursuant to § 1292(b). If § 1292(b) demanded proof of error, that practice would be difficult to reconcile. Rather, § 1292(b), even if interpreted in the strictest possible fashion, merely requires a showing that the district court's conclusions were not clearly correct, even if not clearly erroneous.

The Shaya Orders resolved several questions of law about which there is no consensus, little or no precedent, and much ambiguity. *First*, the Court held that Shaya has (or is subject to) foreign official immunity. It did so by first noting that "[c]ase law involving immunity of nonparty foreign officials is scarce" and it relied (perhaps exclusively) upon a decision of a D.C. district court, *Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247 (D.D.C. 2011), that poses facts that are similar but considerably different; *Giraldo* involved the immunity of a former foreign head of state—a high political official—while this case involves a former state employee. (DE 9 at 12-13, 17-19). Indeed, the suggestion of immunity relied upon in *Giraldo* expressly relied upon the fact that "the Executive Branch had historically accepted this principal of residual immunity and has suggested the immunity from suit of *former heads of State*." Statement of Interest and Suggestion of Immunity of and by the United State of America at 4-5 (emphasis added), filed in *Giraldo v. Drummond Co., Inc.*, No. 10-mc-764 (document 13) (Mar. 31, 2011) (attached as Exhibit I). This is thus an issue of first impression and there is good reason to doubt[6] that the immunity granted to

---

[6] John Bellinger, Israel's attorney, agrees that the implications to sovereign immunity are heightened when a head of state is subpoenaed, and agrees that the fact that President Uribe was a former head of state motivated the State Department's suggestion of immunity in *Giraldo*. John B. Bellinger III, *The Dog that Caught the Car: Observations on the Past, Present, and Future*

a former head of state should be or is coextensive with the immunity, *vel non*, granted to a former relatively low-level security official.

*Second*, the Court held that notwithstanding Israel's promises to the Intervenors that Shaya would be allowed to testify, and the Intervenors' detrimental reliance on that promise, Israel had not waived Shaya's immunity. The Court relied on considerable precedent stating that a foreign sovereign's waiver of immunity must be explicit. (DE 9 at 21-23). The Intervenors do not question that precedent, only its application to this case. Given the nature of the allegations, it is unsurprising that Israel's waiver of immunity was not in writing. And, as a result, it is impossible to present a copy of that waiver to the Court. But its verbal waiver was explicit, even if Israeli officials did not use the words "waive" or "immunity." Israeli officials expressly stated that Shaya would be permitted to testify. That is no different from stating that Israel would not exercise Shaya's immunity in an effort to prevent him from testifying. Moreover, the Intervenors *did* present written evidence of the intent to allow Shaya to testify in the form of the Matalon Declaration. The Court's conclusion that "no evidence suggests that Israel *intended* to waive Shaya's immunity with respect to the Court's jurisdiction" is therefore questionable. It is certainly not clearly established. Other courts likely would have been inclined, at the very least, to compel Israel to produce contrary evidence establishing that it did not intend to waive Shaya's immunity.

*Third*, the Court held that Shaya's immunity belongs to Israel and can be exercised or imposed by Israel, notwithstanding Shaya's willingness to waive that immunity. In support, the Court relied on no case law at all. Instead, it adopted the litigating position of the United States, as

---

*Approaches of the Office of Legal Adviser to Official Acts Immunities*, 44 VAND. J. TRANSN. L. 819, 828 n.53 (2011). His position is strongly supported by the RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 66(f), which provides that heads of state are entitled to greater immunity than even other high political officials.

articulated through an *amicus* brief to the Supreme Court and in one of its statements of interest. (DE 9 at 14-15, 20). But the U.S.'s litigating position pertained to foreign state sovereign immunity, not to foreign official immunity as here. Moreover, those other statements by the government were not made with the extraordinary circumstances of this case—Israel effectively sponsored litigation in the U.S. in part by designating one of its former employees as a witness and is now attempting to undermine that litigation by reneging on its promise—in mind. Moreover, setting these obvious distinguishing factors aside, it is certain that the U.S.'s litigating position in other cases does not control this litigation and is not persuasive precedent in this litigation. While the Court's conclusion—that foreign official immunity of a former state employee (as opposed to a senior political official) belongs to the state and not the individual, even given the circumstances of this litigation—is plausible, it is nonetheless remarkable and carries with it very significant implications. Given that it lacks support, is highly uncertain, and unquestionably likely to rejected by some even if embraced by others, interlocutory certification is warranted.

In so deciding that Israel is the possessor of Shaya's immunity, this Court simultaneously granted Israel jurisdiction to move to quash the subpoena despite not moving to intervene. The fact that this was a jurisdictional holding renders all the more appropriate a good deal of caution. If the Court's jurisdictional conclusions were erroneous, this entire discussion is moot as Israel had no right or ability to quash the subpoena. In that instance, a great deal of time and resources have already been wasted by the Court and the Parties as a result of Israel's improper motion and immediate review of this jurisdictional question will prevent additional waste.

*Fourth*, the Court held that Israel's national security interests in the information presumed to be sought from Shaya gives Israel an independent interest and thus jurisdiction to move to quash the subpoena. In reaching that position, the Court relied on a document filed in the name of Israeli

-13-

National Security Advisor Yaakov Amidror, which claimed that information learned in Shaya's official capacity was "sensitive and classified." (DE 9 at 15-16). But that document was not properly executed and thus cannot be treated as evidence. 28 U.S.C. § 1746; (DE 1-20 at 27-28). Further, the Court denied the Intervenors the opportunity to cross-examine Amidror or engage in discovery to enable them to verify Amidror's claims. *See* (DE 1-20 at 32-36). Thus, the Court granted jurisdiction to Israel and quashed a subpoena on the *ipse dixit* of a man whose credibility is unknown to the Court and the Parties and on the basis of a document that lacks sufficient indicia of credibility. Certainly, reasonable minds might differ on whether any consideration at all should have been given to the Amidror document. And even those that would give the document some consideration would be likely to differ with the Court's conclusion that the Amidror document is dispositive—a conclusion that rested on *no* pertinent authority.[7]

---

[7] The Court noted that "the D.C. Circuit has 'consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.'" (DE 9 at 16). Those precedents, of course, do not bind this Court or the Second Circuit. More importantly, they are motivated largely by concerns related to federalism. The constitutional system of division of power grants particular Branches of government particular authorities and correspondingly denies those authorities to other Branches. Maintaining the national security is unquestionably a power belonging to the Executive. If the Judiciary were to engage in "searching judicial review," that process would undermine the separation of powers. Moreover, errors in Executive assessments in national security are subject to political review, as was made very clear following the Iraq war and President George W. Bush's remarkable decline in popularity after the public apparently rejected the claims that Iraq under Saddam Hussein posed a significant security risk to the United States.

Neither the federalism concern nor the political model to correct errors is present with regard to a properly sworn and admissible declaration or affidavit from a foreign official. The only federal body with authority to review foreign documents is the Judiciary and there is no political check on excesses taken by foreign officials. Accordingly, this Court's grant of extreme deference to the Amidror document was arguably inappropriate. It was certainly not supported by authority.

*Fifth*, the Court held that Israel has authority to quash the Shaya subpoena on the ground that Shaya is not "within 100 miles" of the place of the deposition. (DE 9 at 23-24). The Court relied on no authority for the proposition that the "100-mile rule" can be invoked by a party other than the deponent when the deponent is willing to travel more than 100 miles and was compensated for his expenses. As the Intervenors argued previously, the 100-mile rule exists to protect non-party witnesses, not third parties that suffer no harm as a result of the travel burden. (DE 1-20 at 31). Certainly, reasonable minds could so conclude and thus differ with the Court's unstated conclusion to the contrary. It should be noted that Shaya himself has appeared before this Court and informed this Court that he is personally willing to testify. Exhibit H.

Further, even assuming Israel had standing to assert the 100-mile rule on Shaya's behalf, reasonable minds could differ as to whether the subpoena could simply be modified to provide that Shaya would be deposed in Israel rather than in Washington, D.C. The Court's opinion does not address that issue and there does not appear to be any precedent indicating that modification would be inappropriate under the circumstances.

*Sixth*, and finally, the Court quashed the Shaya subpoena notwithstanding that a far less-intrusive and less disruptive solution existed. The Court could have easily allowed Shaya to be deposed while preventing the Intervenors and Plaintiffs from asking questions of Shaya that would implicate Israel's security interests or sovereignty. Indeed, the Intervenors previously represented to the Second Circuit that

> [they] understand that not every question that they might desire to ask Mr. Shaya
> will be answered. Nor do they object to Israel's presence during the deposition or
> to direct involvement and supervision by the district court. Similarly, Judge
> Scheindlin has indicated both a willingness and an intent to supervise the
> deposition. Accordingly, this appeal relates to neither privileged *State* information
> (to the exclusion of information the privilege over which previously belonged to
> Israel but has since been waived or is otherwise invalid) nor to improper

-15-

questioning related to official acts. Should the Intervenors or Plaintiffs ask any improper questions, Shaya will refuse to answer, Israel will object, and/or the district court, which has already shown that it is greatly sensitive to Israel's sovereign interests, will intercede as necessary. Rather, this appeal relates to whether the Appellants may question Shaya about things that he knows that are *not* State secrets and about which he may be questioned under controlling law. As a result, and by definition, Israel has no personal interest in preventing such questioning.

*Wultz v. Bank of China*, Second Cir. No. 14-3050, Document 106-1 at 5-6 (2d Cir. Nov. 21, 2014) (Intervenors' Motion to Strike) (footnote and paragraph break omitted). In light of that representation, which the Intervenors repeat here, it is unclear why quashing the subpoena, particularly where the Mr. Shaya does not oppose the subpoena and is willing to testify, was the proper result. Reasonable minds will differ with the Court's conclusion that quashing, as opposed to simply limiting the topics of inquiry, was a proper exercise of discretion.

## Conclusion

For the reasons set forth herein, the Intervenors' motion for interlocutory certification pf the Shaya Orders, pursuant to 28 U.S.C. § 1292(b), should be granted.

Dated: Brooklyn, New York
February 25, 2015

Robert J. Tolchin
Meir Katz, Esq.[*]

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

---

[*] *Of the bars of the State of Maryland and the District of Columbia; admitted in the Federal District Court for the District of Columbia.*